# United States Court of Appeals
## for the
# Third Circuit

UNITED STATES OF AMERICA

*Appellee,*

– v. –

ONE (1) PALMETTO STATE ARMORY PA-15 MACHINEGUN
RECEIVER/FRAME UNKNOWN CALIBER, SERIAL NUMBER
LW001804; WATSON FAMILY GUN TRUST,

*Claimant-Appellant,*

RYAN S. WATSON, Individually and
as Trustee of the Watson Family Gun Trust,

*Plaintiff-Appellant,*

–v. –

ATTORNEY GENERAL OF THE UNITED STATES OF AMERICA;
DIRECTOR OF THE BUREAU OF ALCOHOL, TOBACCO,
FIREARMS, AND EXPLOSIVES

*Defendants-Appellees.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
(NOS. 2:15-CV-02202 AND 2:14-CV-06569) (DAZWELL, J.)

## BRIEF OF LAW CENTER TO PREVENT GUN VIOLENCE AS AMICUS CURIAE IN SUPPORT OF THE APPELLEES AND URGING AFFIRMANCE

| | |
|---|---|
| Jordan Eth | Adam Regoli |
| JEth@mofo.com | ARegoli@mofo.com |
| James R. McGuire | MORRISON & FOERSTER LLP |
| JMcGuire@mofo.com | 4200 Republic Plaza |
| MORRISON & FOERSTER LLP | 370 Seventeenth Street |
| 425 Market Street | Denver, CO 80202-5638 |
| San Francisco, CA 94105-2482 | Telephone: 303.592.1500 |
| Telephone: 415.268.7500 | Facsimile: 303.593.1510 |
| Facsimile: 415.268.7522 | |

*Attorneys for Amicus Curiae Law Center to Prevent Gun Violence*

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(c)(1), the Law Center to Prevent Gun Violence states that it has no parent corporations. It has no stock, and therefore no publicly held company owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ..................................... i

TABLE OF AUTHORITIES ................................................. iv

INTEREST OF *AMICUS CURIAE* ...................................... 1

SUMMARY OF ARGUMENT ............................................ 1

STATUTORY BACKGROUND ......................................... 5

ARGUMENT ................................................................... 7

I.  THE SECOND AMENDMENT DOES NOT
    PROTECT AN INDIVIDUAL RIGHT TO
    POSSESS A MACHINE GUN ................................... 7

    A.  The Second Amendment Grants Only a
        Limited Individual Right ................................... 7

    B.  Possessing a Machine Gun Does Not Fall
        within the Scope of the Second Amendment ................... 8

        1.  Machine Guns Are "Dangerous and
            Unusual" Weapons ............................. 10

            a.  Machine Guns Are Dangerous ................. 13

            b.  Machine Guns Are Unusual ...................... 14

            c.  There Is No Support for
                Appellant's Argument That the
                "Dangerous and Unusual" Test
                Refers to the Manner in Which
                a Weapon Is Carried ................................ 16

        2.  Machine Guns Have Been Subject to
            "Longstanding Regulation" That Is
            Presumptively Lawful ......................... 19

a.     The NFA Regulated Machine
Gun Ownership............................................ 20

b.     FOPA's 18 U.S.C. § 922(o)
Was an Incremental Addition to
the NFA's Regulation of
Machine Gun Ownership .......................... 24

CONCLUSION.................................................................... 26

REQUIRED CERTIFICATIONS......................................... 28

CERTIFICATE OF SERVICE............................................ 29

# TABLE OF AUTHORITIES

**Page(s)**

<span style="font-variant: small-caps">CASES</span>

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) ............................................................ *passim*

*Drake v. Filko*,
   724 F.3d 426 (3d Cir. 2013), *cert. denied*, ___ U.S. ___, 134
   S. Ct. 2134 (2014) ............................................................. *passim*

*Friedman v. City of Highland Park, Ill.*,
   784 F.3d 406 (7th Cir.), *cert. denied*, ___ U.S. ___,
   136 S. Ct. 447 (2015) ................................................... 10

*Fyock v. Sunnyvale*,
   779 F.3d 991 (9th Cir. 2015) ........................................ 14

*Hamblen v. United States*,
   591 F.3d 471 (6th Cir. 2009) ........................................ 12

*Heller v. District of Columbia*,
   670 F.3d 1244 (D.C. Cir. 2011) ............................. 12, 26

*Hollis v. Lynch*,
   ___ F. Supp. 3d ___, Case No. 3:14-cv-03872-M,
   2015 WL 4713277 (N.D. Tex. Aug. 7, 2015) ......... 10, 18

*McDonald v. City of Chicago, Ill.*,
   561 U.S. 742 (2010) .................................................. 1, 7

*National Rifle Ass'n of Am., Inc. v. Bureau of Alcohol,
   Tobacco, Firearms, and Explosives*, 700 F.3d 185 (5th Cir.
   2012) ......................................................................... 19

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
   804 F.3d 242 (2d Cir. 2015) ........................................ 11

*People v. James*,
   174 Cal. App. 4th 662 (Cal. Ct. App. 2009) ................. 14

*United States v. Allen*,
  630 F.3d 762 (8th Cir. 2011) ........................................................ 12

*United States v. Barton*,
  633 F.3d 168 (3d Cir. 2011) ..................................................... 9, 19

*United States v. Fincher*,
  538 F.3d 868 (8th Cir. 2008) ................................................. 12, 14

*United States v. Gilbert*,
  286 F. App'x 383 (9th Cir. 2008)............................................... 12

*United States v. Henry*,
  688 F.3d 637 (9th Cir. 2012) ............................................... *passim*

*United States v. Huet*,
  665 F.3d 588 (3d Cir. 2012) ..................................................... 9, 17

*United States v. Kenney*,
  91 F.3d 884 (7th Cir. 1996)............................................... 6, 24, 25

*United States v. Kirk*,
  105 F.3d 997 (5th Cir. 1997)................................................ *passim*

*United States v. Knutson*,
  113 F.3d 27 (5th Cir. 1997) ........................................................ 25

*United States v. Marzzarella*,
  614 F.3d 85 (3d Cir. 2010) ................................................... *passim*

*United States v. McCartney,*
  357 F. App'x 73 (9th Cir. 2009)........................................... *passim*

*United States v. Miller*,
  307 U.S. 174 (1939) ........................................................... *passim*

*United States v. Pruess*,
  703 F.3d 242 (4th Cir. 2012) ..................................................... 11

*United States v. Salter,*
  Nos. 2:02-cr-20047, 2:11-cv-02114, 2011 WL 5597257
  (W.D. Ark. Aug. 15, 2011)........................................................ 10

*United States v. Skoien*,
614 F.3d 638 (7th Cir. 2010) ....................................................... 20

*United States v. Zaleski*,
489 F. App'x 474 (2d Cir. 2012).................................................. 11

**CONSTITUTIONS, STATUTES, AND BILLS**

U.S. Const. amend. II ...............................................*passim*

Federal Firearms Act of 1938 ............................................................. 6

Gun Control Act of 1968 .............................................................. 6, 24

Firearms Owners' Protection Act of 1986,
Pub. L. No. 99–308, § 101, 100 Stat. 449 (1986) ..................... 6, 24

18 U.S.C. § 922(o).....................................................................*passim*

National Firearms Act, 26 U.S.C. § 5801 *et seq.*(1934)..............*passim*

**OTHER AUTHORITIES**

*Assault Weapons: A View from the Front Lines: Hearing before
the Comm. on the Judiciary*, 103d Cong., 1st Sess. 183, 185-
86 (1994) ...................................................................................... 13

Bill Yenne, *Tommy Gun: How General Thompson's
Submachine Gun Wrote History* (2009) ........................................ 20

Brian L. Frye, *The Peculiar Story of United States v. Miller*,
3 N.Y.U. J. L. & Liberty 48 (2008).......................................*passim*

Christopher Ingraham, *There are now more guns than people in
the United States*, WASH. POST: WONKBLOG (October 5,
2014), https://goo.gl/JhsMRX ...................................................... 15

Franklin E. Zimring, *Firearms and Federal Law: The Gun
Control Act of 1968*, 4 J. Legal Stud. 133 (1975) ................... 20, 22

Greg S. Weaver, *Firearm Deaths, Gun Availability, and Legal
Regulatory Changes: Suggestions from the Data*, 92 J. Crim.
L. & Criminology 823 (2001-2002)............................................. 21

John O'Brien, *The St. Valentine's Day Massacre*, CHICAGO
TRIBUNE (Feb. 14, 2014, 2:54 PM)
http://www.chicagotribune.com/news/nationworld/politics/c
hi-chicagodays-valentinesmassacre-story-story.html. ................. 21

Labor Statistics, *CPI Inflation Calculator*,
http://www.bls.gov/data/inflation_calculator.htm (last
visited Jan. 26, 2016)..................................................................... 22

Michael A. Bellesiles, *Firearms Regulation: A Historical
Overview*, 28 Crime & Just. 137 (2001).................................. 15, 22

Office of the Inspector General, U.S. Department of Justice,
*The Bureau of Alcohol, Tobacco, Firearms and Explosives'
National Firearms Registration and Transfer Record,
Evaluation and Inspections Report I-2007-006* (June 2007),
http://www.usdoj.gov/oig/reports/ATF/e0706/back.htm.. ............ 15

Sean J. Kealy, *The Second Amendment As Interpreted By
Congress and the Court*, 3 Ne. U. L.J. 225 (2011) ............... *passim*

William J. Helmer, *The Gun That Made The Twenties Roar*
(1969).................................................................................. 4, 21, 23

# INTEREST OF *AMICUS CURIAE*

*Amicus curiae* the Law Center to Prevent Gun Violence (the "Law Center")

is a national, nonprofit organization dedicated to reducing gun violence.[1]  Founded

after an assault weapon massacre at a San Francisco law firm in 1993, the Law

Center provides comprehensive legal expertise in support of common sense gun

laws.  The Law Center tracks and analyzes federal, state, and local firearms

legislation, monitors Second Amendment litigation nationwide, and provides

support to jurisdictions facing legal challenges to their gun laws.  The Law Center

has provided informed analysis as an *amicus* in a wide variety of important

firearm-related cases nationwide, including the Supreme Court cases *District of

Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, *Ill.*,

561 U.S. 742 (2010).

# SUMMARY OF ARGUMENT

In 2008, in *Heller*, the Supreme Court held for the first time that the Second

Amendment protects the individual right of responsible, law-abiding citizens to

possess an operable handgun in their homes for lawful self-defense.  The Court

was careful to emphasize, however, that this right is "not unlimited," and that the

---

[1] Counsel to the parties have consented to the filing of this brief.  *Amicus* affirms, pursuant to Federal Rule of Appellate Procedure 29(c)(5), that no counsel for a party authored this brief in whole or in part and that no person other than *amicus* and its counsel made a monetary contribution to its preparation or submission.  The Law Center was formerly known as Legal Community Against Violence.

Second Amendment does not protect the "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. In discussing the limits of the Second Amendment right, the Court specifically discussed machine guns, stating that it would be a "startling" reading of the Second Amendment to suggest that "the National Firearms Act's restrictions on machineguns … might be unconstitutional." *Id.* at 624.

In 2010, this Court said that under *Heller* and *United States v. Miller*, 307 U.S. 174 (1939), the Second Amendment does not protect private possession of machine guns because machine guns are "dangerous and unusual" weapons. *United States v. Marzzarella*, 614 F.3d 85, 94 (3d Cir. 2010). Nothing has changed in the meantime. To the contrary, all courts that have considered the issue—including seven federal courts of appeal—have reached the same conclusion: The Second Amendment does not protect private possession of machine guns.

Despite this clear law, Appellant challenges the constitutionality of 18 U.S.C. § 922(o), arguing that it violates the Second Amendment by making illegal private possession of machine guns manufactured after May 19, 1986. There is no basis for Appellant's argument. It should be rejected, and the District Court's judgment should be affirmed.

In *Marzzarella*, this Court adopted a "two-pronged approach" for reviewing Second Amendment challenges. 614 F.3d at 89. First, it considers whether the

challenged law burdens conduct falling within the scope of the Second Amendment. If so—and only then—it would consider the constitutionality of the law "under some form of means-end scrutiny." *Id.* The inquiry in this case should end at the first prong.

The scope of the Second Amendment does not extend to (a) possession of weapons that are "dangerous and unusual," or (b) regulations that are "longstanding" enough to be considered outside its historical scope. *Heller*, 554 U.S. at 624, 626-27. For each of these independent reasons, the Second Amendment does not protect the possession of machine guns. Machine guns are extremely dangerous: As one court said, "[s]hort of bombs, missiles, and biochemical agents, we can conceive of few weapons that are more dangerous than machine guns." *United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012). They are unusual: Machine guns account for just over *0.1%* of the guns in circulation. *See infra* at 15. Machine guns, as another court pointed out, "are not sporting weapons; they are weapons of war. They are guns in the same sense that pussycats and tigers are both members of the cat family." *United States v. Kirk*, 105 F.3d 997, 1004 (5th Cir. 1997).

In addition, these "weapons of war" have been subject to "longstanding" regulation: In 1934, Congress passed the National Firearms Act ("NFA"), "a ban disguised as a tax," which sought to severely limit machine gun ownership. Brian

L. Frye, *The Peculiar Story of United States v. Miller*, 3 N.Y.U. J. L. & Liberty 48, 61 (2008).  The NFA imposed a substantial transfer tax on machine guns ($3,500 in today's dollars) and also imposed similarly substantial annual license taxes on each weapon possessed by dealers, pawnbrokers, and manufacturers ($3,500, $5,300, and $8,800, respectively, in today's dollars).  The year following the NFA's passage, it was reported that not a single machine gun had been sold, except to law enforcement agencies.  William J. Helmer, *The Gun That Made The Twenties Roar*, 153 (1969).  In addition to the NFA, machine guns were regulated at the state level—including outright bans—even prior to 1934.  *See infra* at 23-24. Accordingly, Section 922(o), which Appellant challenges here, was only an "incremental" addition to the longstanding regulation of machine guns that has existed for over 80 years.  *See infra* at 23-25.

Against this backdrop, Appellant offers no credible argument as to why this Court should ignore settled precedent and become the first court to reach the "startling" conclusion that private possession of a machine gun is protected by the Second Amendment.  Instead, Appellant argues that whether a weapon is "dangerous and unusual" has nothing to do with the type of weapon that is at issue, and is instead based on the "manner" in which the weapon is "carried."  This argument is foreclosed by this Court's precedent and has been rejected by the courts that have considered it.  *See infra* at 16-18.  Appellant also argues that

4

machine guns have not been subject to "longstanding" regulation because Section 922(o) did not become law until 1986. Notwithstanding the fact that a law passed in 1986 may be considered "longstanding," in reality, machine guns have been consistently regulated at the federal level since 1934, and for even longer at the state level. *See infra* at 19-26.

The District Court's judgment should be affirmed.

## STATUTORY BACKGROUND

In 1934, in response to increasing crime and violence, Congress passed the NFA. 26 U.S.C. § 5801 *et seq.*; *see also infra* at 20-24 (detailed discussion regarding the NFA). The NFA, among other things, imposed substantial taxes on the manufacture, sale, and transfer of machine guns[2] and other dangerous weapons. 26 U.S.C. § 5811. It also required that all machine guns be registered in the National Firearms Registration and Transfer Record ("National Firearms Registry") and made it a crime to possess an unregistered machine gun. 26 U.S.C. §§ 5841, 5861(d). Although implemented as a tax, the NFA had the intended

---

[2] The NFA defines a "machinegun" as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manually reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person." 26 U.S.C. § 5845(b).

effect of banning, or at least seriously curtailing, private possession of machine guns. *See infra* at 22-23.

Despite several gun safety laws that were passed in the interim—*i.e.*, the Federal Firearms Act of 1938 and the Gun Control Act of 1968 (the "1968 Act")— federal regulation of machine guns was left substantially unchanged for the next 52 years. In 1986, however, Congress passed the Firearms Owners' Protection Act of 1986 ("FOPA"). Pub. L. No. 99–308, § 101, 100 Stat. 449 (1986). FOPA added 18 U.S.C. § 922(o) to the 1968 Act. This section marked an incremental change to the NFA's longstanding regulation of machine guns, making it unlawful for a person to transfer or possess a machine gun that was not legally registered before May 19, 1986. By doing so, 18 U.S.C. § 922(o) froze the number of machine guns available on the market and sought, like the NFA, to limit access to machine guns. *See United States v. Kenney*, 91 F.3d 884, 890-91 (7th Cir. 1996) ("[T]he 1986 addition of § 922(o) was not novel but incremental, merely preventing further growth in the number of machine guns in private hands as an exercise of the historical federal interest in the regulation of machine guns."). Appellant challenges the constitutionality of that statute here.

**ARGUMENT**

## I.   THE SECOND AMENDMENT DOES NOT PROTECT AN INDIVIDUAL RIGHT TO POSSESS A MACHINE GUN

### A.   The Second Amendment Grants Only a Limited Individual Right

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Supreme Court has made clear that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626. As the Supreme Court explained, "[f]rom Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was *not* a right to keep and carry *any weapon whatsoever*...." *Id.* (emphasis added); *see also McDonald*, 561 U.S. at 786. This fact was recognized by the Supreme Court 77 years ago in *United States v. Miller*, 307 U.S. 174 (1939). That case involved a challenge to the NFA's regulatory scheme governing short-barreled shotguns (the same regulatory scheme that governed machine guns). The Court struck down a Second Amendment challenge to the law, finding that the short-barreled shotgun was not protected by the Second Amendment. *Miller*, 307 U.S. at 175, 177; *see also Marzzarella*, 614 F.3d at 90.

Consistent with this precedent, rather than a right to possess any weapon whatsoever, later opinions of both this Court and the Supreme Court have found that the Second Amendment protects only those arms "in common use at the time"

7

and does *not* provide protection for "weapons not typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625, 627; *see also Marzzarella*, 614 F.3d at 90. As *Heller* made clear, the Second Amendment's prefatory clause—"A well regulated Militia, being necessary to the security of a free State"—has no bearing on this analysis despite "the fact that modern developments have limited the degree of fit between the prefatory clause and the protected right...." *Heller*, 554 U.S. at 627-28.

In assessing whether a law violates the Second Amendment, this Court applies "a two-pronged approach…." *Marzzarella*, 614 F.3d at 89. First, it considers "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *Id.* If the law does not fall within the scope of the Second Amendment, the "inquiry is complete." *Id.* If, however, the challenged law does fall within the scope of the Second Amendment, then it is evaluated "under some form of means-end scrutiny. If the law passes muster under that standard, it is constitutional. If it fails, it is invalid." *Id.*

Here, the inquiry should end at the first prong: Possessing a machine gun does not fall within the scope of the Second Amendment.

### B.     Possessing a Machine Gun Does Not Fall within the Scope of the Second Amendment

The Second Amendment does not protect all weapons. For example, restrictions on the possession of weapons deemed "dangerous and unusual" are not

constitutionally suspect "because these weapons are outside the ambit of the amendment." *Id.* at 91; *see also Heller*, 554 U.S. at 627 (noting that "another important limitation on the right to keep and carry arms" is "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'"). As explained below, machine guns are just such weapons.

Alternatively, a regulation will not run afoul of the Second Amendment if it is sufficiently "longstanding" to be considered outside the scope of the right protected. As this Court has stated, "certain longstanding regulations are 'exceptions' to the right to keep and bear arms, such that the conduct they regulate is not within the scope of the Second Amendment." *Drake v. Filko*, 724 F.3d 426, 431 (3d Cir. 2013) (citing *United States v. Barton*, 633 F.3d 168, 172 (3d Cir. 2011), *cert. denied,* ___ U.S. ___, 134 S. Ct. 2134 (2014); *United States v. Huet*, 665 F.3d 588, 600 (3d Cir. 2012)); *see also Heller*, 554 U.S. at 626-27 & n.26 ("longstanding prohibitions" on firearms are "presumptively lawful regulatory measures" that do not run afoul of the Second Amendment). Federal restrictions on machine gun possession date back more than 80 years to the enactment of the NFA in 1934—easily qualifying as "longstanding."

Accordingly, machine guns, and regulations restricting their possession, fall outside the scope of the Second Amendment on both grounds.

## 1. Machine Guns Are "Dangerous and Unusual" Weapons

In *Heller*, the Supreme Court said that it would be a "startling" reading of the Second Amendment to suggest that restrictions on machine gun ownership are unconstitutional. 554 U.S. at 624. Thereafter, this Court, applying *Miller* and *Heller*, made clear that machine guns are not protected by the Second Amendment because they are "dangerous and unusual" weapons. *See Marzzarella*, 614 F.3d at 94 ("[T]he Supreme Court has made clear the Second Amendment does not protect" possession of machine guns.). At least seven other circuit courts have reached similar conclusions in the last eight years:[3]

- In *Friedman v. City of Highland Park, Illinois*, 784 F.3d 406, 408 (7th Cir. 2015), *cert. denied*, ___ U.S. ___, 136 S. Ct. 447 (2015), the Seventh Circuit said that "*Heller* deemed a ban on private possession of machine guns to be obviously valid" (citation omitted).

---

[3] Numerous district courts have also reached this conclusion. *See, e.g.*, *Hollis v. Lynch*, ___ F. Supp.3d ___, Case No. 3:14-cv-03872-M, 2015 WL 4713277, at *15, *16 (N.D. Tex. Aug. 7, 2015) (*Miller* and *Heller* "establish[] that possessing a machine gun, and specifically an M-16 rifle, does not fall within the scope of the Second Amendment…. Every federal circuit that has addressed the issue has held that there is no Second Amendment right to possess a machine gun."); *United States v. Salter*, Nos. 2:02-cr-20047, 2:11-cv-02114, 2011 WL 5597257, at *3 (W.D. Ark. Aug. 15, 2011) ("The District Courts that have addressed the issue have uniformly found that the 2nd Amendment is not violated by a legitimate government interest in controlling certain weapons.").

- In *United States v. Zaleski*, 489 F. App'x 474, 475 (2d Cir. 2012), the Second Circuit held that "the Second Amendment does not protect [an individual's] personal possession of machine guns." *See also N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 256 (2d Cir. 2015) ("*Heller* expressly highlighted weapons that are most useful in military service, such as the fully automatic M–16 rifle, as weapons that could be banned without implicating the Second Amendment.") (quotation omitted).

- In *United States v. Pruess*, 703 F.3d 242, 246 n.2 (4th Cir. 2012), the Fourth Circuit held that the defendant's possession of machine guns, among other weapons, was not "within the scope of the Second Amendment based on the statement in *Heller* that 'the sorts of weapons' the Amendment protects are 'those in common use at the time' of ratification—not 'dangerous and unusual weapons,' which there is 'historical tradition of prohibiting.'" (citation omitted).

- In *Henry*, 688 F.3d at 640, the Ninth Circuit held that "machine guns are highly dangerous and unusual weapons that are not typically possessed by law-abiding citizens for lawful purposes.  Thus, we hold that the Second Amendment does not apply to machine guns." (quotations and citation omitted); *see also United States v.*

*McCartney,* 357 F. App'x 73, 76 (9th Cir. 2009) (holding that machine guns are "dangerous and unusual" and "therefore are not protected by the Second Amendment."); *United States v. Gilbert*, 286 F. App'x 383, 386 (9th Cir. 2008) ("Under *Heller*, individuals still do not have the right to possess machineguns….").

- In *Heller v. District of Columbia*, 670 F.3d 1244, 1270 (D.C. Cir. 2011) ("*Heller II*"), the D.C. Circuit said that "fully automatic weapons, also known as machine guns, have traditionally been banned and may continue to be banned after *Heller*."

- In *Hamblen v. United States*, 591 F.3d 471, 474 (6th Cir. 2009), the Sixth Circuit held that "whatever the individual right to keep and bear arms might entail, it does not authorize an unlicensed individual to possess unregistered machine guns for personal use."

- In *United States v. Fincher*, 538 F.3d 868, 874 (8th Cir. 2008), the Eighth Circuit held that "[m]achine guns are not in common use by law-abiding citizens for lawful purposes and therefore fall within the category of dangerous and unusual weapons that the government can prohibit for individual use."  *See also United States v. Allen*, 630 F.3d 762, 766 (8th Cir. 2011) (same).

Appellant does not cite any cases to the contrary.  The reason for this uniformity is clear: Machine guns are obviously both dangerous and unusual.

### a.      Machine Guns Are Dangerous

A weapon may be considered "dangerous and unusual because of its heightened capability to cause damage." *Marzzarella*, 614 F.3d at 95.  The heightened capability of machine guns to cause damage is clear.  As the Ninth Circuit has noted, "[t]he machine gun was first widely used during World War I, where it demonstrated its murderously effective firepower over and over again." *Henry*, 688 F.3d at 640 (quotation and citation omitted).  "A modern machine gun can fire more than 1,000 rounds per minute, allowing a shooter to kill dozens of people within a matter of seconds…. *Short of bombs, missiles, and biochemical agents, we can conceive of few weapons that are more dangerous than machine guns.*" *Henry*, 688 F.3d at 640 (emphasis added).

The Fifth Circuit has also discussed the heightened capability of machine guns to cause damage, noting that "[m]achine guns possess a firepower that outstrips any other kind of gun.  Persons knowledgeable about firearms, such as those who campaign for repeal of gun regulations, usually emphasize that machine guns stand in a class of their own." *Kirk*, 105 F.3d at 1001 (citing *Assault Weapons: A View from the Front Lines: Hearing before the Comm. on the Judiciary*, 103d Cong., 1st Sess. 183, 185-86 (1994)).  The reason for this is clear:

"The destructive capacity of machine guns puts them in the same category as explosives, which the federal government has heavily regulated for over twenty-five years, except machine guns have little lawful use." *Kirk*, 105 F.3d at 1001; *see also McCartney*, 357 F. App'x at 76 ("McCartney's own expert testified that the machine gun is a dangerous weapon in light of the fact that 'it devastated entire populations in World War I.'"). The fully-automatic nature of machine guns makes them more destructive than semiautomatic assault weapons, which themselves have been found to be dangerous. *See*, *e.g.*, *People v. James*, 174 Cal. App. 4th 662, 676 (Cal. Ct. App. 2009) (semiautomatic assault weapons "are not the types of weapons that are typically possessed by law-abiding citizens for lawful purposes such as sport hunting or self-defense; rather, these are weapons of war."). Indeed, Appellant does not dispute the dangerous nature of machine guns.

### b. Machine Guns Are Unusual

A weapon is "unusual" if it is not "commonly possessed by law-abiding citizens for lawful purposes." *Fyock v. Sunnyvale*, 779 F.3d 991, 997 (9th Cir. 2015) (citation omitted); *see also Heller*, 554 U.S. at 625 ("the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes…."). It is clear that "[m]achine guns are not in common use by law-abiding citizens for lawful purposes…." *Fincher*, 538 F.3d at 874.

"[T]he possession of a machine gun by a private citizen is quite unusual in the United States." *McCartney*, 357 F. App'x at 76. In part, this is "because private possession of all new machine guns, as well as all existing machine guns that were not lawfully possessed before the enactment of § 922(o), has been unlawful since 1986. Outside of a few government-related uses, machine guns largely exist on the black market." *Henry*, 688 F.3d at 640. Figures from the National Firearms Registry support these facts. In 2013, an estimated 357 million guns were in circulation in the United States. *See* Christopher Ingraham, *There are now more guns than people in the United States*, WASH. POST: WONKBLOG (October 5, 2015), https://goo.gl/JhsMRX. According to the National Firearms Registry, machine guns accounted for little more than *0.1%* of this total.[4] Accordingly, nearly *99.9%* of the guns in circulation in the United States are *not* machine guns.

Moreover, there is no lawful purpose for individuals to possess machine guns. *See* Michael A. Bellesiles, *Firearms Regulation: A Historical Overview*, 28 Crime & Just. 137, 175 (2001) (quoting Attorney General Homer Cummings, "[t]here is no legitimate reason on earth for an individual to have possession of a

---

[4] *See* Office of the Inspector General, U.S. Department of Justice, *The Bureau of Alcohol, Tobacco, Firearms and Explosives' National Firearms Registration and Transfer Record, Evaluation and Inspections Report I-2007-006* (June 2007), http://www.usdoj.gov/oig/reports/ATF/e0706/back.htm.

machine gun….").  As one court put it, "[t]here is little social utility in acquiring

… operable machine guns or in making them.  They are not sporting weapons; *they*

*are weapons of war.* They are guns in the same sense that pussycats and tigers are

both members of the cat family."  *Kirk*, 105 F.3d at 1004 (emphasis added); *see*

*also id.* at 1002 ("The firepower of a machine gun puts it in a quite different

category from the handguns, shotguns, and rifles so popular with sportsmen.  Its

continuous fire puts the machine gun on a different plane from the semi-

automatic.").  Such "weapons of war" epitomize the "dangerous and unusual"

weapons that the Second Amendment does not protect.  *Heller*, 554 U.S. at 627.

> **c.      There Is No Support for Appellant's Argument That**
> **the "Dangerous and Unusual" Test Refers to the**
> **Manner in Which a Weapon Is Carried**

Appellant does not dispute that machine guns are "dangerous and unusual"

weapons.  Instead, Appellant argues that *Heller*'s "dangerous and unusual" test has

nothing to do with the dangerousness or unusualness of a weapon at all, and is

instead based on the common law crime of "affray," which focuses on "the *manner*

of how [a weapon is carried], not the type of weapon that is carried…."

Appellant's Br. at 22.  Under this test, Appellant appears to assert that the only

weapons that may be restricted are those that are not "bearable upon the person,"

or those that are not "within the scope of the military equipment issued to the

average infantry soldier."[5]  *Id.* at 45 (Stating that "[a]rms such as shoulder-fired rockets, mortars, and heavy machineguns [are] probably" not protected.). Appellant's argument (a) is foreclosed by this Court's precedent and (b) has been specifically rejected by the courts that have considered it.

This Court confronted the "dangerous and unusual" inquiry in *Marzzarella*, 614 F.3d at 87, 94-95, where its "primary concern … was one of line-drawing, specifically, whether a firearm with an obliterated serial number was a 'dangerous and unusual weapon.'"  *Huet*, 665 F.3d at 602.  This "line-drawing" exercise was necessary because "[a]lthough the Court in *Heller* stated that possession of 'dangerous' firearms is not protected, it did not define what constitutes a 'dangerous' firearm."  *Id.*  In evaluating dangerousness, this Court considered the "heightened capability [of the weapon] to cause damage."  *Marzzarella*, 614 F.3d at 95.  It did *not* consider whether the weapon was "carried" in a lawful "manner," as Appellant argues should be the inquiry here.

This Court's evaluation of "dangerousness" by considering "the heightened capability [of the weapon] to cause damage" was consistent with *Heller*.  *Heller* discussed the "dangerous and unusual" test in the context of "consider[ing] …

<hr>

[5] To the extent that Appellant separately argues that "military equipment issued to the average infantry soldier" is protected under the Second Amendment *without* reference to the common law crime of "affray," that argument should be rejected for the reasons set forth in Appellees' Brief.  *See* Appellees' Br. at 17-19.

*what* types of weapons *Miller* permits[,]" concluding that it "read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Heller*, 554 U.S. at 624, 625 (emphasis in original). *Heller* contains no discussion of the argument that Appellant offers here.

Moreover, as one court remarked in rejecting Appellant's same argument, "[Plaintiff's] attempt to reargue the common law crime of 'affray' does not succeed in light of the Supreme Court's discussion of the exact automatic weapon at issue in this case, the M–16 machine gun." *Hollis*, 2015 WL 4713277, at *15. As that court found, "[i]f the Supreme Court had been limiting its discussion to the carrying of such a weapon, and not to its mere possession, as [Plaintiff] suggests, the Court would have more clearly said so." *Id.* Furthermore, the court noted that "[Plaintiff's] distinction between 'carrying' and 'possession' of automatic weapons is unpersuasive, as the Court in *Heller* described the dangerous and unusual weapons doctrine from *Miller* as a limitation on the right to '*keep* and carry arms'" and thereby "recognized that … the right to keep and bear arms does not include a right to possess a specific firearm or type of firearm." *Id.* at *15, *16; *see also* Appellant's App'x at A34 (District Court Memorandum) ("[Appellant's] contention that *Heller* limits 'dangerous and unusual' weapons only to a threatening manner of carrying them ('affray') finds no support under *Heller*….").

Appellant does not cite any cases to the contrary. Instead, like this Court, the courts that have evaluated whether a weapon is dangerous have focused on the type of weapon at issue, not the "manner" in which the weapon is "carried." *See, e.g.*, *Henry*, 688 F.3d at 640; *McCartney*, 357 F. App'x at 76.

### 2. Machine Guns Have Been Subject to "Longstanding Regulation" That Is Presumptively Lawful

In addition to "dangerous and unusual" weapons, this Court has made clear that certain "longstanding" firearm regulations will also fall outside the scope of the Second Amendment. *See Drake*, 724 F.3d at 431 ("certain longstanding regulations are 'exceptions' to the right to keep and bear arms, such that the conduct they regulate is not within the scope of the Second Amendment."); *see also Barton*, 633 F.3d at 171. To be considered "longstanding," a regulation need not have existed "at the time of the adoption of the Bill of Rights[.]" *Drake*, 724 F.3d at 434. Rather, "a firearms regulation may be 'longstanding' and 'presumptively lawful' even if it was only first enacted in the 20th century…. After all, *Heller* considered firearm possession bans on felons and the mentally ill to be longstanding, yet the current versions of these bans are of the mid-20th century vintage." *Id.* at 434 n.11 (quotation omitted) (citing *National Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 700 F.3d 185, 196-97 (5th Cir. 2012) (upholding as "longstanding" a federal statute prohibiting transfer of firearms from federal licensees to individuals under age 21,

which Congress did not adopt until 1968); *United States v. Skoien*, 614 F.3d 638, 640-41 (7th Cir. 2010) (explaining that 18 U.S.C. § 922(g)(4), which forbids firearm possession by a person who has been adjudicated to be mentally ill, was enacted in 1968)).

### a. The NFA Regulated Machine Gun Ownership

The mid-1920s through the 1930s saw a "tremendous increase in crime" and "an abnormally high homicide rate." Sean J. Kealy, *The Second Amendment As Interpreted By Congress and the Court*, 3 Ne. U. L.J. 225, 253-54 (2011); *see also id.* at n.115 ("[a]ccording to the Justice Department, in 1931, there were 11,160 homicides in the United States, as opposed to 287 in Great Britain for the same year."). The era was marked by the likes of "high profile criminals such as Al Capone, George 'Machine Gun' Kelly, Clyde Barrow, Bonnie Parker, and John Dillinger," *id.* at 253, and public concern focused on "the machine-gun-toting interstate gangster…." Franklin E. Zimring, *Firearms and Federal Law: The Gun Control Act of 1968*, 4 J. Legal Stud. 133, 137 (1975). The Thompson Submachine Gun, or "Tommy Gun," "[d]esigned and manufactured in 1921 as a military weapon, [was] the gangster's weapon of choice." *Kealy*, *supra*, at 259. It fired "in excess of eight hundred rounds per minute and [had] the potential for sheer carnage…." Bill Yenne, *Tommy Gun: How General Thompson's Submachine Gun Wrote History*, 68 (2009). "By the end of the 1920s the submachine gun had

established itself firmly in the public mind as a gangster weapon.  So far as any newspaper reader could tell, only gangsters had submachine guns…."  Helmer, *supra*, at 102.

In 1929, in response to this growing crime wave, and the infamous St. Valentine's Day Massacre[6] in particular, "President Roosevelt proposed a bill that would regulate the sale and possession of handguns and machine guns alike, but these measures remained stalled in Congress until 1934."  Greg S. Weaver, *Firearm Deaths, Gun Availability, and Legal Regulatory Changes: Suggestions from the Data*, 92 J. Crim. L. & Criminology 823, 824 (2001-2002) (footnotes omitted).  However, that year, "prompted in part by the 1933 death of Chicago mayor Anton Cermak during an assassination attempt on President Roosevelt and the activities of John Dillinger, Congress passed the [NFA]."  *Id.*  Doing so, according to Attorney General Homer Cummings, "was an important part of the Justice Department's overall efforts against 'a very serious national emergency.'"  Kealy, *supra*, at 258.

_____

[6] During the St. Valentine's Day Massacre, "seven men were lined up against a whitewashed wall and pumped with 90 bullets from submachine guns, shotguns, and a revolver.  It was the most infamous of all gangland slayings in America, and it savagely achieved its purpose—the elimination of the last challenge to Al Capone for the mantle of crime boss in Chicago."  John O'Brien, *The St. Valentine's Day Massacre*, CHICAGO TRIBUNE (Feb. 14, 2014, 2:54 PM), http://www.chicagotribune.com/news/nationworld/politics/chi-chicagodays-valentinesmassacre-story-story.html.

The NFA "was popularly known as an 'anti-machine gun' law." Zimring, *supra*, at 138 n.29. It taxed the manufacture, sale, and transfer of machine guns, short-barreled rifles and shotguns, and silencers, imposing a $200 transfer tax on these weapons and annual license taxes of $200 on dealers, $300 on pawnbrokers, and $500 on manufacturers. Frye, *supra*, at 61. In today's dollars, those taxes would amount to roughly $3,500, $5,300, and $8,800, respectively. Bureau of Labor Statistics, *CPI Inflation Calculator*, http://www.bls.gov/data/inflation_calculator.htm (last visited Jan. 26, 2016). Given these significant sums, "[o]f course, the NFA was really a ban disguised as a tax, intended to discourage the possession and use of covered firearms." Frye, *supra*, at 61; *see also* Zimring, *supra*, at 138 ("The tax rate, $200 per transfer, did not seem calculated to encourage extensive commerce in these weapons."); Kealy, *supra*, at 258 (quoting congressional testimony from Attorney General Cummings: "A machine gun, of course, ought never to be in the hands of any private individual."). Indeed, upon the NFA's passage, Attorney General Cummings remarked, "[t]here is no legitimate reason on earth for an individual to have possession of a machine gun…. To permit the present situation to continue indefinitely amounts to a disclaimer of national intelligence." Bellesiles, *supra*, at 175.

The NFA's de facto ban on machine guns met little resistance. In congressional testimony, General M.A. Reckford, the executive vice-president of the National Rifle Association ("NRA"), made clear that "the NRA had no objection to the regulation of machine guns and any other 'gangster type' weapons. 'You can be just as severe with machine guns and sawed-off shotguns as you[] desire, and we will go along with you[.]'" *Id.* at 176.

In addition to meeting little resistance, the NFA was also "quite successful. While many people registered NFA firearms, few legitimate dealers could afford to pay the license tax and even fewer legitimate buyers were willing to pay the transfer tax…." Frye, *supra*, at 61 (footnotes omitted). In December 1934, the *New York Times* reported "that not a single machine gun … had been sold, except to law enforcement agencies, since the passage of the [NFA]." Helmer, *supra*, at 153. Accordingly, the NFA accomplished its goal of limiting machine gun ownership and there were no changes in the federal regulation of machine guns for the next 52 years.

In addition to the federal regulation imposed by the NFA, as discussed in Appellees' brief, there has been longstanding regulation of machine guns— including outright bans—at the state level. *See* Appellees' Br. at 16. Although Appellant attempts to pass this off as meaningless, Appellant's Br. at 27, this Court has recognized that a regulation may be upheld as longstanding where it has

existed in some form for a significant period of time, either in a diverse number of

jurisdictions or over a significant portion of the population. *See Drake*, 724 F.3d at

433-34. The various machine gun restrictions noted in Appellees' brief clearly

support each factor and further underscore the longstanding nature of the

regulation that is at issue here.

        **b.    FOPA's 18 U.S.C. § 922(o) Was an Incremental
            Addition to the NFA's Regulation of Machine Gun
            Ownership**

In 1986, Congress continued its longstanding regulation of machine gun

ownership with the passage of FOPA. FOPA added 18 U.S.C. § 922(o) to the

1968 Act. That section makes it unlawful for a person to transfer or possess a

machine gun that was not legally registered before May 19, 1986.

Contrary to Appellant's statements, 18 U.S.C. § 922(o) did not "ban"

machine guns.[7] *See, e.g.*, Appellant's Br. at 24 ("Defendants [sic] Complete Ban

on Machineguns is Categorically Invalid"); *see also id.* ("Here, the government

completely bans a class of bearable firearms."). Rather, "Section 922(o) …

effectively freezes the number of legal machine guns in private hands at its 1986

level." *Kenney*, 91 F.3d at 885; *see also Kirk*, 105 F.3d at 1001 (18 U.S.C. § 922(o)

"left lawful the possession of machine guns manufactured before 1986 and

--------------------------------------------------

[7] Nevertheless, a federal "ban" on machine guns would be constitutional because,
among other reasons, they are "dangerous and unusual." *See supra* at 13-16.

lawfully possessed before that date…. [The statute] froze in place the market in machine guns."). As Appellant's own brief recognizes, "[a]ny machinegun lawfully owned before May 19, 1986 may still be transferred or possessed. Accordingly, there are tens of thousands, if not hundreds of thousands, of machineguns lawfully possessed by private individuals…." Appellant's Br. at 7.

In light of this framework, courts have recognized that "the 1986 addition of § 922(o) was not novel but incremental, merely preventing further growth in the number of machine guns in private hands as an exercise of the historical federal interest in the regulation of machine guns." *Kenney*, 91 F.3d at 890-91. Accordingly, Appellant's argument that "[t]he federal ban on machineguns … is not a longstanding law, as it became law only in 1986[,]" is incorrect.[8] Appellant's Br. at 27. Congress has consistently regulated machine guns, first by way of a prohibitive tax, *see supra* at 22, and later by freezing the number of machine guns on the market. Each of these measures had the same goal: Limiting machine gun ownership. *See United States v. Knutson*, 113 F.3d 27, 30 (5th Cir. 1997) ("Section 922(o) ... is but the latest manifestation of the federal government's longstanding record of regulating machineguns."). Given this history, the

---

[8] While a law passed in 1986 (or later) may qualify as "longstanding," the comprehensive regulation of machine gun ownership here dates back to 1934. Accordingly, the challenged regulatory scheme is unquestionably "longstanding."

challenged regulations are "longstanding" measures that fall outside the scope of the Second Amendment, and nothing in the established case law suggests otherwise.[9]

## CONCLUSION

For the reasons set forth above, this Court should affirm the District Court's judgment. If this Court believes that some form of "means-end scrutiny is required," the District Court's judgment should still be affirmed for the reasons set forth in Appellees' brief.[10] *See* Appellees' Br. at 21-26.

---

[9] Appellant argues that "[i]t is a misreading of *Heller* to argue all long standing prohibitions are presumptively constitutional" and that instead, only "reasonable regulations would continue be constitutional post-*Heller*." Appellant's Br. at 29. However, *Heller* does not say this and this Court has made no such "reasonableness" inquiry in determining that a "longstanding regulation" of firearms is "presumptively lawful." *Drake*, 724 F.3d at 431-34. In any event, Appellant offers no argument why machine gun regulation is "unreasonable," especially in light of *Heller*'s contrary statement that it would be "startling" to conclude restrictions on machine guns are unconstitutional. *Heller*, 554 U.S. at 624.

[10] As discussed in Appellees' brief, if the Court applies any form of "means-end scrutiny," intermediate scrutiny would be appropriate given that Section 922(o) leaves open a wide array of alternatives for lawful self-defense. *See* Appellees' Br. at 21-22; *see also Marzzarella*, 614 F. 3d at 97; *Heller II*, 670 F.3d at 1261-62.

Dated: January 28, 2016

Respectfully submitted,

MORRISON & FOERSTER LLP

By: _s/ Adam Regoli_
Adam Regoli (CO Bar No. 48947)

4200 Republic Plaza
370 Seventeenth Street
Denver, CO 80202-5638
Telephone: 303.592.1500

Jordan Eth (CA Bar No. 121617)
James R. McGuire (CA Bar No. 189275)
425 Market Street
San Francisco, CA 94105-2482
Telephone: 415.268.7500

Attorneys for _Amicus Curiae Law Center to Prevent Gun Violence_

# REQUIRED CERTIFICATIONS

I hereby certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Times New Roman, a proportionally spaced front.  I further certify that this brief complies with the type volume limitation of Fed. R. App. P. 32(a)(7)(B) and Fed. R. App. P. 29(d) because it contains 6,233 words, excluding the parts of the brief exempted under Rule 32(a)(7)(B)(iii), according to the count of Microsoft Word.

I further certify the following:

- I am a member in good standing of the bar of this Court.

- The text of the electronic brief is identical to the text in the paper copies.

- The electronic brief has been scanned for viruses with Symantec Endpoint Protection version 12.1.6 and found to be virus free.

By: _____*s/* Adam Regoli_____
Adam Regoli (CO Bar No. 48947)
4200 Republic Plaza
370 Seventeenth Street
Denver, CO 80202-5638
Telephone:  303.592.1500

## CERTIFICATE OF SERVICE

I hereby certify that on January 28, 2016, I electronically filed the foregoing Brief with the Clerk of this Court by using the appellate CM/ECF system. The participants in this case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

By: ___*s/* Adam Regoli_____
Adam Regoli (CO Bar No. 48947)
4200 Republic Plaza
370 Seventeenth Street
Denver, CO 80202-5638
Telephone: 303.592.1500