# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

———————

UNITED STATES OF AMERICA,

v.

ONE (1) PALMETTO STATE ARMORY PA-15 MACHINEGUN
RECEIVER/FRAME UNKNOWN CALIBER, SERIAL NUMBER LW001804;
WATSON FAMILY GUN TRUST, Claimant,

(D.C. No. 15-cv-02202)

———————

RYAN S. WATSON, Individually and as Trustee of the Watson Family Gun Trust,
Plaintiff-Appellant,

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA; DIRECTOR
BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES,
Appellee.

(D.C. No. 14-cv-06569)

———————

Appeal from the United States District Court for the Eastern District of Pennsylvania
D. Ct. Civil No. 2:15-cv-02202 (consolidated with 2:14-cv-06569) (Dalzell, J.)

## APPELLANT'S REPLY BRIEF

———————

ALAN ALEXANDER BECK
LAW OFFICE OF ALAN BECK
4780 Governor Drive
San Diego, CA 92122
(619) 905-9105

STEPHEN D. STAMBOULIEH
STAMBOULIEH LAW, PLLC
P.O. Box 4008
Madison, MS 39130
(601) 852-3440

# TABLE OF CONTENTS

**Pages(s)**

TABLE OF AUTHORITIES…………………………………………....…………..ii

ARGUMENT……………………………………………………………..…...1

I.  STANDING

    A. Appellant Has Standing To Bring His Second Amendment Claim…...…………………………………………………………1

II.  THE SECOND AMENDMENT APPLIES, PRIMA FACIE, TO APPELLANT'S MACHINEGUN………………………………….…..2

III.  THIS COURT SHOULD NOT REWRITE FEDERAL LAW FOR THE BENEFIT OF APELLEES…………………………………………..8

IV.  THIS COURT SHOULD INDEPENDENTLY VERIFY THE MEANING OF DANGEROUS AND UNUSUAL…………………………...…12

CONCLUSION……………………………………………………..…..16

REQUIRED CERTIFICATIONS...………………………...…………..…17

CERTIFICATE OF SERVICE …………………….………………….……..…18

# TABLE OF AUTHORITIES

## Cases

*D.C. v. Heller*, 554 U.S. 570 (2008) .............................................................. *passim*

*INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987) (Scalia, J., concurring) ................................ 8

*Kolbe v. Hogan,* No. 14-1945 (4th Cir., Feb. 4, 2016) (slip op) ................................... 14, 15

*McDonald v. Chicago*, 561 US 742 (2010). ............................................................. 2

*Obergefell v. Hodges*, 135 S. Ct. 2584 (2015) ......................................................... 1

*State v. Herrmann*, 2015AP53-CR, 2015 WL 7432597 (Wis. App. Nov. 24, 2015) ...... 2, 3

*State v. Kessler,* 289 Ore. 359, 368, 614 P.2d 94, 98 (1980) ............................... 4

*U.S. v. Kirk*, 105 F.3d 997 (5th Cir. 1997) ........................................................... 7

*United States v. Miller, 307 U.S. 174 (1939).* ................................................ *passim*

*Util. Air Reg. Group v. E.P.A.*, 134 S. Ct. 2427 (2014) ................................... 11

*White v. United States*, 601 F.3d 545 (6th Cir. 2010) ........................................... 1

## Statutes

18 U.S.C. § 921 ...................................................................................... 10

18 U.S.C. § 922(g)(1) .............................................................................. 11

18 U.S.C. § 922(o) .................................................................................. 11

## Other Authorities

132 Cong. Rec. 9,602 (1986) ....................................................................... 5

*Armor Piercing Ammunition and the Criminal Misuse of and Availability of Machineguns and Silencers: Hearings on H.R. 641 and Related bills Before the Committee on the Judiciary, 98th Congress, 1st Sess. 132* (1984). ............................................................. 6

S. Rep. No. 90-1097, at 28 (1968)........................................................................ 10

*Regulations*

81 FR 2661 ....................................................................................................... 9

## I.   STANDING

### A. Appellant Has Standing To Bring His Second Amendment Claim

Appellees claim that "[Watson] cannot satisfy the Article III standing requirement of redressability, because he *likely* would be barred from possession a machine gun (sic) by Pennsylvania law even if he prevailed in this action." App. Br. p. 9. (italics added). Notice the word *likely*, which indicates that Appellees are speculating. The District Court analyzed the case cited by Appellees in their briefing, *White v. United States*, 601 F.3d 545, 552 (6th Cir. 2010) and was not persuaded by Appellees' argument. A20. Judge Dalzell further stated, "Unlike the state statutes at issue before the Sixth and Ninth Circuits, the Commonwealth statute at issue here does not supply freestanding grounds to forbid machine gun use or possession, if the maker or owner 'complie[s] with the National Firearms Act…" A21. The district court is correct in its analysis.

Appellees next state, "The district court suggested that plaintiff's injury is redressable because striking down the federal regulation of machine guns on Second Amendment grounds would necessarily render the Pennsylvania law invalid." App. Br. p. 12. Pennsylvania does not independently ban machineguns, and but for the federal machinegun ban, Appellant would be allowed to possess machineguns registered with the BATFE. However, if this Court were to state that machineguns were protected by the Second Amendment, it is clear that any prohibition on the manufacture or the possession by Pennsylvania law fails, regardless if they are a party or not. *See Obergefell v. Hodges*, 135 S. Ct. 2584, 2606 (2015) (finding a right to same-sex marriage and that

states must recognize lawful marriages performed in other states). *Obergefell* is fatal to the Appellees' contention that Pennsylvania must be a party to this proceeding. Additionally, a pronouncement from this Court that the Second Amendment protects machineguns would invalidate a state law to the contrary.

Appellees' argument that the Appellant would be prohibited from possessing a machinegun under Pennsylvania law would also fail under the Supreme Court's holding in *McDonald v. Chicago*, 561 US 742 (2010). *McDonald* held that federal Second Amendment protections apply to the states through the Fourteenth Amendment's Due Process Clause. If this Court held that Appellant's right to possess a machinegun was protected under the Second Amendment, the holding would strike down any state restrictions on the possession of machineguns in accordance with *McDonald*.

## II.   THE SECOND AMENDMENT APPLIES, PRIMA FACIE, TO APELLANT'S MACHINEGUN

Appellees advise that states "have long restricted other weapons deemed dangerous and uncommon."   Appellee Br. p.16.  See also Fn. 4.  While this Court is not bound by a Wisconsin Court of Appeals case, the following is instructive.  In *State v. Herrmann*, 2015AP53-CR, 2015 WL 7432597 (Wis. App. Nov. 24, 2015), Herrmann was convicted of keeping an automatic knife (a switchblade) in his home for self-defense.  Wisconsin bans possession of automatic knives.   Wisconsin argued the same as the state always argues: protecting the public.  Yet in *Herrmann*, just as the Appellees here, the State cited:

no evidence to establish that [attacks with switchblades] actually exists to any significant degree. Again, the State has the burden to establish that § 941.24(1) satisfies intermediate scrutiny, and it must do so by showing the existence of real, not merely conjectural, harm. See *Turner Broad. Sys.*, 512 U.S. at 664.

*State v. Herrmann*, 2015AP53-CR, 2015 WL 7432597, ¶12. Sharing the same rationale as the tradition of prohibiting carrying dangerous and unusual weapons, the court further stated:

> Moreover, as applied to Herrmann, Wis. Stat. § 941.24(1) is not substantially related to the State's cited objective of protecting the public from surprise attacks. It is undisputed that Herrmann possessed his switchblade in his own home for his protection. The threat to the public of a surprise attack by a person possessing a switchblade in his or her own residence for the purpose of self-defense is negligible. Consequently, while banning possession of switch-blades in other settings might be substantially related to the State's cited objective of protecting the public from surprise attacks, prohibiting individuals from possessing switchblades in their own homes for their own protection is not.

*Id.* at ¶13. Further, in Fn. 9 of the opinion, the *Herrmann* court stated:

> Although the *Heller* Court emphasized that handguns are frequently used for self-defense, we do not think *Heller* can be read to create different levels of protection for different types of arms that fall under the Second Amendment, <u>based on their popularity</u>. In addition, it is not particularly surprising that handguns are more prevalent than switchblades, given that switchblades were banned or severely restricted in many states, including Wisconsin, beginning in the late 1950s and early 1960s.

*Id.* at Fn. 9. This is directly analogous to Appellant and his M-16. While the government may have an interest in prohibiting the *carry* of an M-16, certainly Appellant cannot be prohibited from mere possession in his own home, for his own protection, of a firearm that he legally registered (and was approved by the BATFE) pursuant to the NFA.

Further, the "popularity" of said arm cannot provide the basis for the protection. At the infancy of any weapon's design it could be considered unpopular or unusual.

Appellees cling to the *Heller* court's "startling" language regarding *Miller's* interpretation of short-barreled shotguns. App. Br. p. 17. And then in footnote 5, Appellees confuse what the Supreme Court stated in *Heller's* interpretation of *United States v. Miller, 307 U.S. 174 (1939)*. Appellees' statement that the Gun Control Act (and the machinegun ban) was not at issue in the 1939 *Miller* case does not change that the Supreme Court in *Heller* stated set forth here for full context

> We may as well consider at this point (for we will have to consider eventually) *what* types of weapons *Miller* permits. Read in isolation, *Miller's* phrase "part of ordinary military equipment" could mean that only those weapons useful in warfare are protected. That would be a startling reading of the opinion, since it would mean that the National Firearms Act's restrictions on machineguns (not challenged in *Miller*) might be unconstitutional, machineguns being useful in warfare in 1939. We think that *Miller* 's "ordinary military equipment" language must be read in tandem with what comes after: "[O]rdinarily when called for [militia] service [able-bodied] men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time." 307 U.S., at 179, 59 S.Ct. 816. The traditional militia was formed from a pool of men bringing arms "in common use at the time" for lawful purposes like self-defense. "In the colonial and revolutionary war era, [small-arms] weapons used by militiamen and weapons used in defense of person and home were one and the same." *State v. Kessler,* 289 Ore. 359, 368, 614 P.2d 94, 98 (1980) (citing G. Neumann, Swords and Blades of the American Revolution 6–15, 252–254 (1973)). Indeed, that is precisely the way in which the Second Amendment's operative clause furthers the purpose announced in its preface. We therefore read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns.

*D.C. v. Heller*, 554 U.S. 570, 624-25 (2008). Clearly, in 2008, the Supreme Court could have commented on the Gun Control Act, yet chose not to. The fact that *Miller* predated the Gun Control Act has no bearing on the Supreme Court's comment on the National Firearms Act. A reading of *Miller* to protect "only those weapons useful in warfare" would be "startling" does not equate to a pronouncement from the Supreme Court that machineguns are not protected arms. Quite the opposite, *Heller* directly held that "the Second Amendment extends, prima facie, to *all instruments that constitute bearable arms*, even those that were not in existence at the time of the founding." *Id.* at 582 (emphasis added). Under *Heller*, the Appellant's M-16 would be afforded "prima facie" Second Amendment protections because it is a bearable arm. Appellees concede that the prefatory clause of the Second Amendment "suggests one purpose underlying the Second Amendment," and the Supreme Court was correct holding that the prefatory clause "does not suggest that preserving the militia was the *only* reason Americans valued the ancient right…" *Id.* at 599. (emphasis added). App. Brief. p. 29.

Appellees further cite to Senator Ted Kennedy, quoted in 132 Cong. Rec. 9,602 (1986) when he stated, "The only thing that has changed about the machinegun situation since the 1968 act … is that machine guns [sic] have become a far more serious law enforcement problem." App. Br. p.5. However, in 1984, at a hearing before Congress, then Director of the BATFE Stephen E. Higgins testified specifically about the NFA and *lawfully registered machineguns*. Director Higgins stated,

These weapons are held by collectors and others; only rarely do they figure in violent crime. In this connection, the question of why an individual would want to possess a machinegun or, more often, a silencer, is often raised. We would suggest that ATF's interest is not in determining why a law-abiding individual wishes to possess a certain firearm or device, but rather in ensuring that such objects are not criminally misused. **The regulatory scheme for dealing in or legally possessing NFA weapons and silencers is straightforward and provides safeguards which are adequate, in normal circumstance, to ensure that the firearms remain in the hands of law abiding individuals.**

*Armor Piercing Ammunition and the Criminal Misuse of and Availability of Machineguns and Silencers: Hearings on H.R. 641 and Related bills Before the Committee on the Judiciary, 98th Congress, 1st Sess. 132* (1984). (emphasis added). Director Higgins testified that "registered machineguns which are involved in crimes are so minimal so as not to be considered a law enforcement problem." *Id.* With conflicting statements, one from a Congressman and the other from Director Higgins of the BATFE, it is clear to see which is more credible. Director Higgins' statement is clearly reliable since he was the head of the BATFE, the federal agency tasked with handling firearms. Either machineguns are a scourge upon law enforcement, or lawfully registered machineguns, owned presumptively by law-abiding citizens, are not a law enforcement problem.[1] Director Higgins' testimony was based on the truths that criminals are not going to go through the onerous National Firearms Act's registration scheme, pay the tax, wait six to nine months for approval, and then, and only then, commit their crimes. Senator

---

[1] Senator Kennedy's *ipse dixit* aside, if the Appellees' position mirrors the Senator's, then it can easily be proven with hard data and facts and the Appellees should be required to prove their contention.

Kennedy may have intended his comment in a narrower scope, as only applying to non-registered (and thus unlawfully owned) machineguns, but nonetheless, Director Higgins' testimony is dispositive of the law-abiding citizens' possession of machineguns. Lawfully owned machineguns are NOT a law enforcement problem. The Supreme Court has already rejected the notion that banning arms for the law-abiding is justified to prevent unlawful use by criminals. *Heller* at 636.

Appellees state, "Indeed, 'a machine gun's destructive capacity makes it highly useful for protecting commerce in contraband such as narcotics.'" *U.S. v. Kirk*, 105 F.3d 997, 1004 (5th Cir. 1997) (Higginbotham, J., concurring). App. Br. p. 25. However, the Appellees fail to acknowledge the major difference between all cases cited and the one before this Court. Appellant, Watson, is an attorney barred in Pennsylvania and New Jersey as well as a law-abiding citizen. The cases cited by Appellees all involve criminals, conducting criminal activities, with inanimate objects. These cases cited are not applicable to the issues before this Court because Appellant is not a criminal. Should Congress ban cars that exceed seventy miles per hour because the majority of states limit speed on the interstates to seventy miles per hour? Perhaps some of those cars are utilized in the transportation of contraband such as narcotics. Rhetorical questions aside, the burden is on the government to demonstrate law-abiding citizens' misuse of machineguns. The Appellees have not and cannot satisfy their burden of proving that lawfully owned machineguns create a danger.

In fact, Appellees concede they do **not** address law-abiding ownership of machineguns. The case before this Court is about a law-abiding citizen, who applied for, and received, permission to make a machinegun from the agency tasked with enforcing the firearms laws. **This case** is not about protecting narcotics commerce or any other criminal misuse of a machinegun. But as stated *supra*, Appellees' argument is foreclosed by *Heller*. *Heller* at 636. Appellees' attempt to shift the burden to Appellant to "dispute that a machine gun would be significantly more dangerous than a handgun if used in a crime, or that more criminals would choose to use machine guns were they readily available" is not proper. App. Br. p. 26. Appellant has no duty to prove the governments' contention and the criminal misuse of a tool. This burden lies solely with the government and should not be the basis for infringing on Appellant's Second Amendment rights. Therefore, Appellant is not a prohibited person, and the Second Amendment applies, prima facie, to his bearable M-16.

### III. THIS COURT SHOULD NOT REWRITE FEDERAL LAW FOR THE BENEFIT OF APPELLEES

Statutory text always trumps "unenacted legislative intent." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 453 (1987) (Scalia, J., concurring). Appellees' primary argument against Appellant's interpretation of the Gun Control Act (hereafter "GCA") is that they do not like its outcome. Accordingly, they ask this Court to engage in purpose driven jurisprudence in order to write into the GCA a definition of a person that simply does not exist. If the BATFE has an issue with the GCA as written, the proper procedure

to remedy the issue is to have Congress amend it. What the Appellees ask is outside the traditional role and function of this Court and the judicial branch. This Court should decline Appellees' invitation to legislate from the bench.

The reality is at the time of the passage of the GCA, trusts were not frequently used to own NFA items. Traditionally, trusts were used to quickly disperse estates and recently trusts have been used to own NFA items. In fact, in the BATFE's new rule regarding trusts or legal entities, the BATFE states a "finding that the number of Forms 1, 4 and 5[2] it received from legal entities that are neither individuals nor Federal Firearms Licensees[3] [] increased from approximately 840 in 2000 to 12,600 in 2009 and to 40,700 in 2012…" 81 FR 2661.

At the time of the ratification of the GCA, Congress simply did not include trusts within the definition of a person. As is his right, Appellant found an exemption to this onerous regulation in order to own a machinegun. If Appellees disagree, they should address the issue with Congress, not take the law into their own hands. This Court should not act outside the scope of its traditional role and function to appease the Appellees because of Congress' alleged nonfeasance.

---

[2] For the benefit of the Court, a Form 1 is a form for "making" a machinegun, suppressor, short-barreled shotgun, short-barreled rifle, etc. A Form 4 is a tax-paid transfer form for an already made NFA item and a Form 5 is a form used for a tax-free transfer utilized for transferring NFA items to heirs.

[3] Essentially this means trusts or corporations/partnerships.

As discussed in Appellant's Brief, the term "person" is defined in the GCA to mean "any individual, corporation, company, association, firm, partnership, society, or joint stock company." See 18 U.S.C. § 921. The term "person" does not include an unincorporated trust. Appellees argue that Appellant's interpretation of the statute "would render the Act meaningless by allowing anyone to avoid its prohibitions by establishing an unincorporated trust." App. Br. 27. Congress wrote the law. If Congress wanted to preclude "unincorporated trusts" from owning machineguns, even post-May 19, 1986 machineguns, they would have included the term "trust" in the definition of "person." Congress did not include the term trust. Appellant alleges that the BATFE has allowed transfers of other post-May 19, 1986 machineguns, but because the District Court proceeding did not progress into discovery, at minimum this case should be remanded and Appellant should be granted discovery to prove or disprove his allegations about post-May 19, 1986 transfers.

While Appellant does not concede that a felon could own firearms as a Trustee of an unincorporated trust, as Appellees allege,[4] the law banning felons from owning firearms did not come into existence until 1968. In 1968, Congress included in both the Omnibus Crime Control Act and the Gun Control Act of 1968, Pub. L. No. 90-618, Title I, § 101, 82 Stat. 1213, statutory provisions limiting firearms access by persons with "criminal background[s]," S. Rep. No. 90-1097, at 28 (1968). These provisions include

---

[4] *See* App. Br. p. 27.

18 U.S.C. § 922(g)(1), which provides that "[it] shall be unlawful for any person . . . who has been convicted in any court of[] a crime punishable by imprisonment for a term exceeding one year . . . to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." This statute post-dated the National Firearms Act, which was adopted in 1934, thirty-four years before the Gun Control Act's felon dispossession statute. If 18 U.S.C. § 922(o) is poorly written, it is not the job of the agency to rewrite it how it sees fit. The Supreme Court has plainly stated "that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Reg. Group v. E.P.A.*, 134 S. Ct. 2427, 2446 (2014). The government's fear-mongering about felons does nothing for its position on machineguns as this case is not about a felon in possession as previously stated. Appellant is not a felon nor is he prohibited from owning firearms under Federal or State law.

Interestingly, Appellees allege that machineguns "are not well suited for any private lawful purpose" and that "[machineguns] are no more useful for self-defense than are nonautomatic guns in all but a tiny fraction of civilian uses." App. Br. P. 25. It is peculiar because the government stated in a prior request for proposal that, "DHS and its components have a requirement for a 5.56x45mm NATO, *select-fire* firearm *suitable*

*for personal defense use* in close quarters and/or when maximum concealment is required."[5] Select-fire simply means that the firearm can function as either semi-automatic or fully automatic, meeting the federal definition of a machinegun. The Appellees' hypocritical argument of "do as I say, not as I do" is contrary to the founding principles of our nation. Appellees' claim that machineguns are valid for governmental self-defense but not for civilian self-defense is erroneous and laughable. Machineguns are either valid for self-defense or they are not valid for self-defense.

## IV. THIS COURT SHOULD INDEPENDENTLY VERIFY THE MEANING OF DANGEROUS AND UNUSUAL

Appellees use the phrase "dangerous and unusual" throughout their brief. Appellant concedes that a majority of courts that interpret *Heller's* "dangerous and unusual" language has determined it refers to is the danger a weapon poses, however as stated previously it is not the weapon who is dangerous, rather the person possessing it. No court has been presented with historical analysis of the phrase. It also does not appear that any court independently researched the phrase. The cases Appellant cites in his opening brief are mostly taken directly from *Heller*. If this Court does an independent analysis of the cases presented, it will see that Appellant's analysis is correct and the carrying of dangerous and unusual weapons refers to historical time, place and manner

---

[5]
https://www.fbo.gov/?s=opportunity&mode=form&id=d791b6aa0fd9d3d8833b2efa08300033&tab=core&_cview=0 (underlining added) (last accessed February 2, 2016).

restrictions on carry. Moreover, logic dictates that this phrase refers to something other than an intrinsic characteristic of a weapon.

In *District of Columbia v. Heller*, Justice Scalia wrote:

> We also recognize another important limitation on the right to keep and carry arms. *Miller* said, as we have explained, that the sorts of weapons protected were those "in common use at the time." 307 U.S., at 179, 59 S.Ct. 816. We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of "dangerous and unusual weapons."

When read in context, the phrase dangerous and unusual must support the fact that weapons in common use are protected. Assuming the amicus of the Law Center to Prevent Gun Violence's definition is correct, it does not logically follow that simply because dangerous and unusual weapons are not protected, weapons in common use are protected. For this passage to make sense there must be a logical relationship between the two phrases.

*Miller* provides for a test to determine whether something is protected by the Second Amendment. "Common use" is the output of the test. The weapons protected are those that survive the *Miller* test and historically those were the weapons Colonial Americans typically possessed which at the time were of the quality required to serve in the militia.

The common use language is supported by the tradition of prohibiting the carrying of dangerous and unusual weapons. This is because this tradition only refers to regulation on the carrying of protected arms and armor. At Common Law, subjects

had a general right to carry protected arms as these arms were protected by our Common Law right to defense.

Once it is established that an arm was protected, English and early American governments could not strip the right to carry those weapons without cause. Rather they had to establish that one had carried a weapon in an unusual manner, thus, allowing them in the eyes of the law to punish the *carrying of said weapon*. The fact that the burden was shifted to the government supports that these arms were protected. If a weapon was not protected, the government could ban the carry without any justification. Thus, the tradition of prohibiting the carrying of dangerous and unusual weapons supports the facts that one had a historical right to own protected arms at Common Law, rather than this ownership being allowed as a whim by the Crown.

In a published opinion on February 4, 2016, the Fourth Circuit in *Kolbe v. Hogan*, No. 14-1945 (4th Cir., Feb. 4, 2016) (slip op) held that an AR-15 is a protected arm and that a complete ban on that arm is subject to strict scrutiny. *See Kolbe*, Sections III.A and III.B. As has been demonstrated in the instant case, Appellant's lawfully owned M16 meets the appropriate *Heller* and *Miller* tests, is likewise a protected arm, and if any level of scrutiny should apply, strict scrutiny is warranted.

In *Kolbe*, it is obvious that the back and forth between the majority and dissent highlights why it is necessary for this Court to analyze the phrase dangerous and unusual because the current interpretation suffers from a number of logical flaws. For instance, the majority questions, "How is a court to determine which weapons are too dangerous

to implicate the Second Amendment?" *Id.* at p. 30. The *Kolbe* court stated that "*Heller* refers to 'dangerous' <u>and</u> 'unusual' conjunctively, suggesting that even a dangerous weapon may enjoy constitutional protection if it is widely employed for lawful purposes..." and that "Founding era understandings of what it means for something to be 'unusual' reflect that the firearm must be rare to be considered 'unusual.'" *Id.* at p. 31. *Kolbe* further stated that "If the firearm in question is commonly possessed for lawful purposes, it certainly isn't 'rare' and thereby 'unusual.'" *Id.*

The dissent in *Kolbe* has a different interpretation of the phrase. As the dissent points out, "...since all firearms are dangerous, the dangerous-and-unusual standard is really only concerned with whether a given firearm is unusual..." *Id.* at p. 68. The dissent exposes the logical problem associated with taking the terms "dangerous and unusual" at face value: "...even accepting that an 'unusual' weapon is one that is not commonly possessed, 'what line separates 'common' from 'uncommon' ownership is something the [<u>Heller</u>] Court did not say.'" *Id.* at p. 72. (citation omitted). The dissent then stated "It follows that the term 'unusual' most likely does not have the meaning accorded to it by my colleagues." *Id.* at p. 73.

Appellant urges this Court to make an independent inquiry into the meaning of dangerous and unusual weapons as it does not stand for what the Appellees allege. After doing so, it will see that both logic and history supports Appellant's definition and Second Amendment rights to possesses a bearable machinegun.

## <u>CONCLUSION</u>

Appellant asks this Court to uphold the Second Amendment and find that the Second Amendment protects his ownership of a bearable M-16. There is no question that Appellant Watson's M-16 is the quintessential military and militia rifle of its time, and thus, is protected under the Second Amendment.

We respectfully request the judgment of the lower court to be reversed.

Respectfully Submitted,

<u>/s/ Alan Beck</u>              <u>/s/ Stephen D. Stamboulieh</u>
Alan Alexander Beck        Stephen Dean Stamboulieh
Counsel for Appellant        Counsel for Appellant

## <u>REQUIRED CERTIFICATIONS</u>

I hereby certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Garamond, a proportionally spaced font. I further certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 4,260 words, excluding the parts of the brief exempted under Rule 32(a)(7)(B)(iii), according to the count of Microsoft Word.

I further certify to the following:

I am a member in good standing of the bar of this Court.

The text of the electronic brief is identical to the text in the paper copies.

The electronic brief has been scanned for viruses and found to be virus free.

/s/Stephen D. Stamboulieh
Stephen@sdslaw.us
Counsel for Appellant

## CERTIFICATE OF SERVICE

I hereby certify that on February 4, 2016, I electronically filed the foregoing Reply Brief with the Clerk of this Court by using the appellate CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

/s/Stephen D. Stamboulieh
Stephen@sdslaw.us
Counsel for Appellant